UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIELSEN CONSUMER LLC<br>d/b/a NielsenIQ,<br><div align="right">Plaintiff,</div><br><div align="center">-v-</div><br>THE NPD GROUP, INC.,<br><div align="right">Defendant.</div> | 22-CV-3235 (JPO)<br><br>**<u>REDACTED</u>**<br><br><u>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br>ON MOTION FOR PRELIMINARY<br>INJUNCTION</u> |

J. PAUL OETKEN, District Judge:

On April 20, 2022, Plaintiff Nielsen Consumer LLC, d/b/a NielsenIQ ("NielsenIQ") filed

the complaint in this action against Defendant the NPD Group, Inc. ("NPD"), asserting claims

under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, as well as breach of contract

and other common law claims.  NielsenIQ also filed a motion for a preliminary injunction,

seeking to enjoin NPD from completing an anticipated merger with another entity, Information

Resources, Inc. ("IRI"), "until adequate assurances are provided that [certain confidential data]

will not be used by any third parties without NielsenIQ's express, written consent."  On May 17,

2022, the Court heard oral argument on the motion for preliminary injunction.  On May 18,

2022, the Court denied the motion to the extent that it sought to enjoin the merger, but ordered

NPD to comply with certain commitments with respect to the treatment of confidential

information during the pendency of the litigation or under further order of the Court.  (*See* ECF

Nos. 78, 79.)

NielsenIQ appealed the denial of its motion for a preliminary injunction to the United

States Court of Appeals for the Second Circuit.  On October 14, 2022, the Second Circuit issued

a summary order remanding the matter to this Court pursuant to the procedures adopted in

*United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).  In that order, the court directed this

Court to "enter an order clarifying its rationale for finding that NPD's commitments adequately protect Nielsen," to "clearly state its findings on the record," and, "if warranted, [to] issue an order that specifies the enjoined acts . . . ."  (ECF No. 115 at 5.)

On remand, this Court permitted the parties to file proposed findings of fact and conclusions of law as well as responses to the opposing party's proposed findings and conclusions.  (*See* ECF No. 120.)  Both parties have filed proposed findings and conclusions and responsive briefs.  (*See* ECF Nos. 123, 125-26, 128-30, 133, 135.)

The Court now issues its findings of fact and conclusions of law in accordance with the Second Circuit's remand order.

## I.    Findings of Fact[1]

Nielsen Consumer LLC d/b/a NielsenIQ ("NielsenIQ") is a market research firm that provides manufacturers and retailers with data analytics to help them understand relevant consumer behavior and how that behavior drives product sales and purchasing trends.  (ECF No. 19 ¶ 3.)

NielsenIQ collects and licenses market sales and consumer information to retailers and manufacturers of consumer packaged goods ("CPGs").  (ECF No. 19 ¶ 4.)  CPGs are products that consumers frequently use and replenish, including grocery items (e.g., produce, meat, seafood, dairy), household care items, pet supplies, and health and beauty items.  (*Id.*)

The NPD Group, Inc. ("NPD") is a market research firm that collects, analyzes, and sells information about consumer behavior to its commercial customers.  (ECF No. 33 ¶ 5; ECF No. 37 ¶¶ 9-11.  NPD's strategy has been to focus on the two other main industry sectors of

---

[1] To the extent that any of the following findings of fact are deemed to be conclusions of law, and to the extent that any of the conclusions of law set forth below are deemed to be findings of fact, they are adopted as such.

consumer data:  the general merchandise sector and the food service sector.  (ECF No. 37 ¶ 14.)

General merchandise ("GM") products are products that consumers purchase episodically, such

as sneakers, televisions, and kitchen appliances.  (ECF No. 37 ¶ 13.)  The food service ("FS")

sector covers meals prepared outside consumers' homes, such as by restaurants and caterers.

(ECF No. 37 ¶ 13.)

 NielsenIQ's largest competitor is Information Resources, Inc. ("IRI"), which also

focuses on the CPG sector.  (ECF No. 19 ¶¶ 12, 77; No. 37 ¶ 14.)

 NielsenIQ uses consumer panels to collect, organize, and analyze consumer shopping

data.  (ECF No. 19 ¶ 5.)  A panel is a tool for gathering ongoing data from shoppers to gain

insight into their attitudes, behaviors, and purchasing habits.  These panels generate data by

surveying large numbers of panelists and then having consumers record their purchases,

generally through capturing the receipts.  (*Id.*)  The data collected in a panel is used to generate

multiple metrics, including consumer demographics, how much consumers purchase, what

brands they consider, how often they shop, what percentage of them buy a certain product, and

what brands they buy repeatedly.  (ECF No. 19 ¶ 8.)                    ███████

 To ensure reliable, high-quality data, a panel generally requires at least          panelists.

(*Id.* ¶ 6.)  Reliable data also requires certain demographic compositions of panelists.  (*Id.*)

Before data can be commercialized, a large sample m███████████████████ure

████████████████████████████████████████████████████████

██████████████████████████████████  (*Id.*)  NielsenIQ provides data to customers

pursuant to contractual agreements ███████████████████████████████

███████████████████████  (*Id.* ¶ 9.)

NPD began development of a mobile application called "ReceiptPal" in 2013.  Through ReceiptPal, NPD collects purchase receipts and other information from a consumer panel.  (ECF No. 37 ¶¶ 27-29.)  Since 2015, NPD has commercialized the GM and FS data and demographic information from ReceiptPal by analyzing the data and licensing that analysis to end users under NPD's "Checkout" service.  *(Id.* ¶¶ 30, 72.)

In 2018, NielsenIQ and NPD entered into the agreement that is at the heart of the parties' dispute:  the "Data and Intellectual Property License Agreement" (the "Agreement" or "Agmt.").  Recitals in the Agreement state that (1) "



(2)

(Agmt. at 1.)

NPD owns the ReceiptPal panel and app as well as the "NPD Data," which the Agreement defines as "

" (Agmt. § 1.1.)

"                         " is defined in the Agreement as

" (Agmt. § 1.1.)

The Agreement makes clear that ██████████████████████████████████

████████████████████████████████████████ (Agmt. § 1.1;

§ 6.1 ("███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████).)

The Agreement also ████████████████████████████████████

████████████████████████



(Agmt. § 1.5.)

Under Section 7.2 of the Agreement, ██████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████" (Agmt.

§ 7.2.)

██████████████████████████████████████████████████

████████████████████████████████ (ECF No. 62 ¶ 51; Agmt. Appx A & § 2(c).)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████" (Agmt. § 1.1.)  Specifically, the Agreement ███████████████████████

███████████████████████████████████████":



(Agmt. § 1.2.)  This section then provides that █████████████████████████

███████████████████████

(Agmt. § 1.2.)

          The Agreement ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ (Agmt. § 1.2; Appx. A.)

NielsenIQ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Agmt. § 2; Amendment

§§ 1(a), 4.)  Although ReceiptPal had only about 30,000 panelists in 2018, that number grew to

100,000 by the second year of the Agreement.  (ECF No. 19 ¶ 48.) ████████████████████

████████████████████████████████████████████████████████████

██████████ (ECF No. 33 ¶ 18.) ████████████████████████████████████████

█████████████████████████████████ (*Id.*)

Section 5.1 of the Agreement provides ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ (Agmt. § 5.1.) ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████" (*Id.*)

On April 7, 2022, NPD announced a merger with IRI.  (ECF No. 35 ¶ 2.)

On April 20, 2022, NielsenIQ filed the complaint and motion for preliminary injunction

in this case.  In its complaint, NielsenIQ alleged:  (1) ████████████████████████████

████████████████████████████████████████████████████████████

██████ ; and (2) that NielsenIQ's confidential information and trade secrets ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

misappropriation of NielsenIQ's confidential trade secrets.  NielsenIQ identified the following trade secrets:



(ECF No. 19 ¶ 35.)

In seeking a preliminary injunction, NielsenIQ asked the Court to enjoin NPD from (1) "completing its merger with IRI until adequate assurances are provided that NielsenIQ's exclusive CPG Licensed Data will not be used by any third parties without NielsenIQ's express, written consent," and (2) "using or disclosing NielsenIQ's exclusive confidential information and trade secrets without NielsenIQ's express, written consent."  (ECF No. 17-1 at 1.)[2]

On May 2, 2022, NPD, through counsel, provided the following written assurances to NielsenIQ:



---

[2] During the May 17, 2022 preliminary injunction hearing, NielsenIQ proposed two alternative forms of relief:  imposing a "firewall" preventing NPD-IRI from accessing the ReceiptPal service after the merger; and requiring NPD to spin off ReceiptPal to an LLC.  (Tr. 16-17.)



(ECF No. 34-4 at 2.)

With respect to *exclusivity*, the Court finds that the above restrictions — provided they are enforced by an injunction pending litigation of this case — are sufficient to protect NielsenIQ's ███████████████████████████████████████ under the Agreement. By their terms, these restrictions (1) ██████████████████████████████████



(2) ███████ (3) ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████" The record establishes that NPD has the means and ability to implement these restrictions post-merger (ECF No. 37 ¶¶ 89-94), and this Court has the power to enforce them.

With respect to *confidential and proprietary information*, the Courts finds that the above restrictions — provided they are enforced by an injunction pending litigation of this case — are sufficient to protect NielsenIQ's rights of confidentiality under the Agreement and with regard to NielsenIQ's proprietary trade secret information.

NielsenIQ's primary argument is that the fourteen categories of "proprietary information" have become "embedded" into ReceiptPal as the service has developed and improved over time, such that NPD would be using (and misappropriating) NielsenIQ's proprietary information whenever it uses ReceiptPal data — even *non*-CPG data from ReceiptPal. However, NielsenIQ is unlikely to succeed on the merits of this broad argument. Under the Agreement, ███████ ███████ ███████ ███████ (Agmt. § 1.5 (emphasis added).) ███████ ███████ ███████ (*Id*.) ███████ ███████ the Agreement is "███████ ███████" (*Id*. (emphasis added.)  At least with respect to non-CPG data (GM and FS data) from ReceiptPal, the better reading of the Agreement supports NPD's right to use the embedded "improvements" in ReceiptPal.

NielsenIQ's secondary argument is that certain items in three of the fourteen categories of allegedly proprietary information — categories 9 through 11 — have been or are in danger of being misappropriated by NPD *independently* of the "embedded" nature of NielsenIQ's improvements to ReceiptPal. ██████████████████████████████████████ ████████████████████████████  (ECF No. 62 ¶ 51.)  In fact, what the evidence shows is that NPD appears to have in its possession a handful of documents in these categories — documents that were previously shared by NielsenIQ with NPD voluntarily, which is not surprising given the parties' partnership.  The evidence does not show that NPD has disclosed or used these documents in violation of the Agreement.  NPD has secured and restricted these specific documents, and by declaration, swears that it has not used them, will not use them, and will not share them with IRI or anyone else.  (ECF No. 37 ¶¶ 55, 58.)

Because documents in these three categories are likely to contain NielsenIQ's proprietary information, and because use of such documents by a competing post-merger NPD-IRI could potentially result in irreparable harm to NielsenIQ, the Court will order that any such documents be restricted and shall not be used by NPD or disclosed to any other entity.  However, the risk of irreparable harm does not require or justify a more draconian remedy, such as enjoining the merger or requiring the merged entity to spin off ReceiptPal.  First, the evidence indicates that there is a small number of documents in NPD's possession that constitute NielsenIQ's proprietary information.  (ECF No. 37 ¶¶ 55-59.)  Second, the risk of actual irreparable harm to NielsenIQ from the use or disclosure of any of these documents, while present, is ultimately likely to be marginal and limited.  That is because, as the Court has explained, █████████████ ████████████████████████████████    ████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## II.      Conclusions of Law

### A.      Legal Standards

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because NielsenIQ

brings a federal claim under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*  The Court

has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

In the Second Circuit, a party seeking a preliminary injunction "must establish

(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently

serious questions going to the merits of its claims to make them fair ground for litigation, plus a

balance of the hardships tipping decidedly in favor of the moving party; and (3) that a

preliminary injunction is in the public interest." *Conn. State Police Union v. Rovella*, 36 F.4th

54, 62 (2d Cir. 2022) (cleaned up).

"In all cases, the [preliminary injunctive] relief should be 'narrowly tailored to fit specific

legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley*

*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub.*

*Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).

"[O]n a motion for a preliminary injunction, where essential facts are in dispute, there

must be [an evidentiary] hearing . . . and appropriate findings of fact must be made." *Fengler v.*

*Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir. 1987) (cleaned up).  However, "[t]here

is no hard and fast rule in [the Second Circuit] that oral testimony must be taken on a motion for

a preliminary injunction or that the court can in no circumstances dispose of the motion on the

papers before it." *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989).

A party can waive or forfeit a right to an evidentiary hearing.  *See id.* ("[Defendant], having been content to rest on affidavits submitted to the District Court, waived its right to an evidentiary hearing.")

The Court concludes that an evidentiary hearing was unnecessary here.  The record before the Court — including the Agreement, the undisputed facts, and the detailed declarations submitted by the parties — was sufficient to permit the Court to make the findings necessary to resolve the motion for a preliminary injunction.  Moreover, NielsenIQ did not request an evidentiary hearing and therefore forfeited any right to such a hearing.[4]  *See Consol. Gold Fields*, 871 F.2d at 256.

## B.    Irreparable Harm

Irreparable harm requires "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'"  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (citation omitted).

Based on the above factual findings, the Court concludes that NielsenIQ has not established irreparable harm from the merger that it seeks to enjoin.  A more narrowly tailored remedy — substantially coextensive with commitments made by NPD but in the form of injunctive relief — would sufficiently protect NielsenIQ against the danger of any actionable irreparable harm.  *See Faiveley Transp.*, 559 F.3d at 119.   The Court addresses each of NielsenIQ's two principal theories in turn.

### 1.    

---

[4] In a footnote in its reply brief, NielsenIQ stated: "To the extent it would assist the Court, [NielsenIQ] is prepared to put on live witnesses . . . ."  (ECF No. 60 at 8 n.1.)  This statement does not constitute a sufficient request for an evidentiary hearing, particularly given that no party requested the opportunity to present live testimony during the telephonic hearing on May 17, 2022.

NielsenIQ sought to enjoin NPD from "completing its merger with IRI until adequate assurances are provided that █████████████████████████████████████████ ████████████████████████████████████ (ECF No. 17-1 at 1.) █████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████

The parties dispute the scope of Section 1.2's █████████████. NPD argues that it is ██████████████████████████████████," while NielsenIQ argues █████████████. Although this particular dispute over interpretation of Section 1.2 presents a "serious question[] going to the merits," *Conn. State Police Union v. Rovella*, 36 F.4th at 62, that close question need not be resolved to decide the motion before the Court. On either interpretation, NielsenIQ's argument for irreparable harm is based on █████████████████████████████████████ ████████████████████████████████████. And the real basis for this prospect is the fact of NPD's merger with IRI itself — not an implausible concern on NielsenIQ's part, given that IRI is NielsenIQ's main competitor in the CPG sector. Thus, the Court concludes that NielsenIQ would face potential irreparable harm if █████████████ ████████████████████████████████.

However, as the Court has found, the restrictions that the Court will enforce by preliminary injunction are sufficient to guard against any irreparable harm to NielsenIQ's █████████████████████████████████████████under the Agreement. These restrictions (1) ██████████████████████████████████████████████, (2) █████████

14

 (3) ███████████████████████ ███████████████████████ ██████████████████████.ʺ  NPD has the means and ability to implement these restrictions post-merger, and this Court has the power to enforce them.

### 2.    Confidentiality

Nielsen also IQ sought to enjoin NPD from "using or disclosing NielsenIQ's exclusive confidential information and trade secrets without NielsenIQ's express, written consent."  (ECF No. 17-1 at 1.)  As the Court has found, however, the restrictions that will be enforced by preliminary injunction are sufficient to prevent any actionable irreparable harm to NielsenIQ's rights of confidentiality under the Agreement and with regard to NielsenIQ's proprietary trade secret information.

First, potential harm to NielsenIQ based on its broad "reverse engineering" theory — that numerous types of "proprietary information" have become "embedded" into ReceiptPal as the service has improved, such that NPD uses and misappropriates NielsenIQ's proprietary information whenever NPD uses ReceiptPal data — is not actionable harm. ██████████ ████████████████████████████ ██████████████████████████████ ███████████  (Agmt. § 1.5 (emphasis added).)

Second, as the Court has found, with respect to specific instances of proprietary NielsenIQ information that NPD may possess independently of the "reverse engineering" theory, the limited preliminary injunctive relief will sufficiently guard against irreparable harm to Nielsen.  While the evidence of such instances is quite limited, and while the evidence does not show that NPD has disclosed or used these documents in violation of the Agreement, it is true

that documents in these three categories are likely to contain NielsenIQ's proprietary information.  And because the use of such documents by a competing post-merger NPD-IRI could potentially result in irreparable harm to NielsenIQ, the Court orders that any such documents be restricted and shall not be used by NPD or disclosed to any other entity.  However, as the Court has found, the risk of irreparable harm does not require or justify a more draconian remedy, such as enjoining the merger or requiring the merged entity to spin off ReceiptPal, to protect NielsenIQ's rights of confidentiality.

### 3.  Money Damages

Third, although the Court has determined that there is some risk of irreparable harm justifying limited injunctive relief pending litigation, the Court also concludes that monetary damages are likely to constitute adequate compensation for any broader harm to NielsenIQ that ultimately turns out to be actionable.  *See Dexter 345 Inc.* 663 F.3d at 63.  As the Second Circuit has held, "where there is no danger that a misappropriator will disseminate proprietary information, 'the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Faiveley Transp. Malmo AB*, 559 F.3d at 119 (quoting *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996)).  NielsenIQ has not shown that NPD has disseminated or is likely to disseminate NielsenIQ's proprietary information; rather, its principal claim is that NPD-IRI will use its trade secrets ███████████████████████████ ch competition centers on a product in particular competitive markets — ReceiptPal — and competitive injury in this case is likely to be reasonably quantifiable.

### C.  Likelihood of Success on the Merits

To obtain a preliminary injunction, a party must establish "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party . . . ." *Conn. State Police Union v. Rovella*, 36 F.4th at 62.

The ReceiptPal raw data provided to NielsenIQ under the Agreement includes consumer data from all three sectors — CPG, GM, and FS.  (ECF No. 62 ¶ 51; Agmt. Appx A & § 2(c).)



(Agmt. § 1.1.)  Specifically, the Agreement

(Agmt. § 1.2.)  This section then provides

(Agmt. § 1.2.)

The Agreement ███████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ (Agmt. § 1.2; Appx. A.)

The parties dispute the scope of Section 1.2's ████████████ NPD argues that it is

██████████████████████████████ while NielsenIQ argues ████████████████

This particular dispute over interpretation presents a "serious question[] going to the merits."

*Conn. State Police Union v. Rovella*, 36 F.4th at 62.  However, it is not necessary to resolve this

question to decide the motion before the Court.  On either interpretation, NielsenIQ's claim is

based on the prospect that ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

With respect to confidential, proprietary, and trade secret information, NielsenIQ's

primary argument is that the fourteen categories of "proprietary information" have become

"embedded" into ReceiptPal as the service has developed and improved over time, such that

NPD is using and misappropriating NielsenIQ's proprietary information whenever it uses

ReceiptPal data — even *non*-CPG data from ReceiptPal.  The theory, in other words, is that

NielsenIQ's confidential and proprietary information can be "reverse engineered" by NPD when

it uses ReceiptPal because that information has been embedded into ReceiptPal through

Nielsen's improvements to the product.

NielsenIQ is unlikely to succeed on the merits of this argument.  First, under the

Agreement, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ (Agmt. § 1.5 (emphasis added).) ██████████████████

██████████ is defined ██████████████████████████████████

██████████ (*Id.*)  Moreover, ██████████████████████████████

██████████████████████████████████████████" (*Id.* (emphasis added.)

Second, this argument proves too much, resulting in an implausible construction of the

Agreement. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ . ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████ *See* Agmt. Recitals ("██████████████████

████████████████████████████████████████████

██████████████████████████████████████████"); Agmt. § 1.2

(████████████████████████████████); Agmt. § 1.5 (████████████████

████████████████████████████████████████"); Agmt. § 6.1

("████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████"). 

Third, NielsenIQ's interpretation is further undermined by Section 5.1 of the Agreement.

That provision ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ Further, that section provides that, ████████████████



" The parties thus contemplated

**D.     Balance of Hardships and Public Interest**

In light of the Court's conclusions regarding irreparable harm and likelihood of success

on the merits, it is unnecessary to address the factors of balance of hardships and the public

interest with respect to the requested relief of an injunction against a merger or a spin-off of

ReceiptPal.

**III.     Conclusion and Preliminary Injunction**

Based on the foregoing Findings of Fact and Conclusions of Law, NielsenIQ's motion for

a preliminary injunction is GRANTED in part and DENIED in part, as follows:

**Pending decision in this case or further order of this Court, it is hereby ORDERED that:**

**1.     NPD shall provide NielsenIQ exclusivity with respect to CPG data from ReceiptPal,**

**meaning that NPD shall not use such data to compete with NielsenIQ or license such**

**data.  For the avoidance of doubt, such exclusivity shall include CPG data from the**

**ReceiptPal Reserve Panelists (*i.e.*, those in excess of the roughly 100,000 for whom**

**data is being provided to NielsenIQ) and will exclude the Overlap Categories as**

**defined in Appendix A, § 2(c) of the Agreement.**

2.      **NPD shall restrict access for anyone other than Restricted Persons (defined as those individuals with a need to know the relevant information to service operations relating to ReceiptPal for NielsenIQ) to all information added by NielsenIQ available on Sharepoint and Trello shared resource systems.  NielsenIQ shall be able to control any contributions of additional information to those systems, and it may designate that any such information shall be limited only to Restricted Persons.**

3.      **NPD shall restrict access to CPG data from ReceiptPal so that, except with respect to the Overlap Categories as defined in Appendix A, § 2(c), it is accessible only to Restricted Persons.**

4.      **To the extent that NielsenIQ identifies any specific information delivered to NPD that is a NielsenIQ trade secret, NPD shall secure and shall not use that information. Specifically, NPD shall secure and shall not use the contents of NielsenIQ's** ███████

███████████████████████████████████████████████

███████████

5.      **Plaintiff's motion for a preliminary injunction is otherwise denied.**

The parties shall confer and, within 14 days after the date of this order, shall submit any proposed redactions to this order so that a redacted version can be filed on the docket.

**The Clerk of Court is directed to restrict access to this document to "party view only" and include title only in ECF text.**

SO ORDERED.

Dated: March 20, 2023
       New York, New York

_____
                          J. PAUL OETKEN
                          United States District Judge

*Redactions approved and*
*so ordered: August 28, 2023*