UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIELSEN CONSUMER LLC, d/b/a NielsenIQ,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　-v-<br><br>CIRCANA GROUP L.P., f/k/a The NPD Group, L.P.,<br><br>　　　　　　　　　　Defendant. | 22-CV-3235 (JPO)<br><br>**REDACTED**<br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

This dispute stems from the planned (and now consummated) merger of NPD Group, L.P. ("NPD") with Information Research, Inc. ("IRI").  NPD had already been in a years-long course of dealing with Nielsen Consumer LLC, doing business as NielsenIQ ("Nielsen"), IRI's largest and primary competitor.  Pursuant to the agreement between NDP and Nielsen, the parties shared trade secret data with one another and were mutually obligated not to disclose each other's secrets.  Nielsen initiated this action to enjoin the merger and the disclosure of Nielsen's protected trade secrets to a competitor.  Nielsen also seeks damages and other relief for such disclosure.  Before the Court is NPD's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, NPD's motion to dismiss is granted in part and denied in part.

I.      **Background**

    A.      **Factual Background**[1]

Circana Group, L.P., known as The NDP Group, L.P. during the period relevant to this case ("NPD" or "Defendant"), is an analytics firm that sells insights about consumer choices gleaned from sophisticated data analysis.  (FAC ¶ 32; ECF No. 150.)  NPD owns and uses a mobile application, ReceiptPal, to collect consumers' purchase receipts and other information about three categories of products: (1) general merchandise ("GM"), or products purchased episodically, like cars; (2) foodservice ("FS"), or meals prepared outside the home; and (3) consumer packaged goods ("CPGs"), which are frequently replenished, like groceries.  (FAC ¶ 19, 33.)  Nielsen Consumer LLC, which does business as NielsenIQ ("Nielsen" or "Plaintiff"), is a market research firm; Nielsen focuses specifically on the CPG sector in which it has significant market share due, at least in part, to its thirty-plus years of experience.  (FAC ¶¶ 18 – 20, 79.)  Nielsen runs consumer panels and other surveys of hundreds of thousands of respondents, and it sells this information to businesses to assist in their product and marketing decisions.  For context, ███████████████████████████████████████ ███████████████████████████  (FAC 62.)  ReceiptPal, as relevant here, is a tool for the solicitation of specific and rare consumer information; as a mobile application, it prompts consumers to provide the service information about their consumer choices after consummating a transaction via Amazon.  In this business, the more data a firm has, the more it profits.

On January 2, 2018, the parties entered a licensing agreement (the "Agreement") under which ███████████████████████████████████████████████████████████████

───────────────────

[1] The following facts are taken from the First Amended Complaint ("FAC") and assumed true for the purposes of evaluating this motion to dismiss.

███████ (*See* FAC ¶ 40.) ████████████████████████████████

███████████████████████████████████████████████████

████████████████ (FAC ¶ 45.)  The Agreement specified that, ████████████

███████████████████████████████████████████



(ECF No. 93-1 ("Agmt.") § 1.5).  This section defined █████████████████████████"

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

(Agmt. § 1.1.)  Nielsen agreed that, ███████████████████████████

███████████████████████████████████████████████

████████████████████████ (Agmt. § 6.1.) ████████████████

██████████████████████████ (*See* Agmt. § 1.2.)

The Agreement ████████████████████████████████████████

██████████████████████████

(*Id.*)  The Agreement also clarified:



(*Id.*) ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (FAC ¶ 35.) ███████████

████████████████████████████████ (FAC ¶ 50.)

Finally, the Agreement provides that, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████ (Agmt. § 5.1.) ███████████████████████ (*Id.*) ███████████

████████████████████████████████████████████

████████████████████████████ (*See id.*)

The parties participated in a multi-year course of dealing that facilitated the development

of ReceiptPal. ████████████████████████████████████████

████████ (FAC ¶ 50.) ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (FAC ¶ 42.)

In October 2021, the parties' relationship began to deteriorate.  (FAC ¶ 102.)  The parties

particularly disagreed over expanding the size of the ReceiptPal consumer panel and how such

expansion would be paid for.  (FAC ¶¶ 104 – 17.) ████████████████████████

████████████████████████████████████████████████

████████████████████████ (FAC ¶ 119.)  On April 7, 2022, NPD publicly announced a

merger with Information Resources, Inc. ("IRI"), Nielsen's principal competitor in the CPG

market ███████████████████████████████████████████

███  (FAC ¶ 6.) ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███  (FAC ¶ 7.) ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ (*Id.*) ██████████████████████

████████████████████████████████████████ (*See*

FAC ¶ 35.)  Nielsen alleges that IRI is consummating the merger ████████████████

████████████████████ (*See* FAC ¶¶ 6, 57, 63.)

**B.  Procedural History**

On April 15, 2022, Nielsen initiated this action.  (ECF No. 1.)  On July 7, 2022, Plaintiff

filed its First Amended Complaint (the "FAC").  (FAC ¶ 1.)  The FAC, still operative, asserts

seven claims against NPD and seeks both money damages and injunctive relief.  (FAC ¶ 9.)

Claims 1, 2, and 3 are contract claims alleging (1) ███████████████████████

████████████████████████████████████████████

████████████████████ (2) that Nielsen is entitled to a declaratory judgment

with respect to the parties' rights and obligations as a result; and (3) that NPD engaged in

anticipatory breach of the Agreement by announcing the merger with IRI.  (FAC ¶¶ 180 – 218).

Claim 4 alleges that NPD violated the implied duty of good faith and fair dealing.  (FAC ¶¶ 219

– 234.)  Claim 5 asserts a claim under the federal Defend Trade Secrets Act (the "DTSA")

premised on misappropriation of Nielsen's trade secrets.  (FAC ¶¶ 235 – 64.)  Claim 6 is a

parallel trade secrets misappropriation claim under New York common law.  (FAC ¶¶ 265 –

276.)  Finally, Claim 7 sounds in the tort of unfair competition under New York common law.

(FAC ¶¶ 277 – 92.)

On April 20, 2022, Nielsen sought a preliminary injunction, which the Court resolved on

an expedited timeline.  (*See* ECF No. 11, 12, 21.)  The Court denied the motion on May 18,

2022, following a telephonic hearing held the previous day.  (ECF Nos. 78, 79.)  On March 20,

2023, on remand from the Second Circuit, this Court issued detailed findings of fact and

conclusions of law in support of its decision denying a preliminary injunction against NPD's

merger with IRI.  (ECF No. 137, *Nielsen Consumer LLC v. NPD Grp. L.P.*, No. 22-cv-3235

(S.D.N.Y. March 20, 2023) (hereinafter "*Nielsen I*").)  However, ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████  *Id.* at 21.

Pursuant to Federal Rule 12(b)(6), NPD moved to dismiss the FAC on August 19, 2022,

arguing that it failed to state plausible claims for relief.  (ECF Nos. 99, 100.)

## II.  Legal Standard

To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint alleges

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  Complaints have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court should dismiss a

complaint where "the allegations in [the] complaint, however true, could not raise a claim of

entitlement to relief."  *Twombly*, 550 U.S. at 558.  Courts must accept all allegations and draw all

inferences for the plaintiff while generally limiting itself to the face of the complaint.  *See*

*Steginsky v. Xcelera Inc.*, 741 F.3 365, 368 (2d Cir. 2014).

III.    **Discussion**

The Court begins with Nielsen's claims for breach of the Agreement.  The Court then turns to Nielsen's DTSA claim, followed by its state-law trade secret misappropriation and implied covenant of good faith claims.  Finally, the Court addresses NPD's request in the alternative for a more definitive statement.

A.    **Contract Claims (Claims 1, 2, 3)**

"Under New York law[,] 'there are four elements to a breach of contract claim: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Golub Capital LLC v. NB Alt. Advs. LLC*, 2022No. 21-cv-3991 (LJL), WL 540653, at *7 (S.D.N.Y. Feb. 22, 2022) (quoting *Mancuso v. L'Oreal USA, Inc.*, 2021 WL 124328, at *3 (S.D.N.Y. April 2, 2021)).  Here, NPD attacks only the element of breach, arguing every one of its challenged acts, including the merger, was authorized by the Agreement.

Nielsen has two primary theories of breach of the Agreement as well as an argument that

████████████████████████████████████████████████████████

████████      First, Nielsen claims that NPD violated ██████████████████████

████████████████████████████████████████████████████████

Second, Nielsen contends that NPD has violated (or threatens to violate) ██████████

████████████████████████████████████████████

██████████████████████████████      the Agreement encompasses ██████████████

████████████████████████████████      (Agmt. § 7.1.)  Section 7 further

provides that.████████████████████████████████████████

████████████████████████████████████████████

████████████████████████      (Agmt. § 7.2.)  NPD argues that, in fact, its

███████████████████████████████████████████████████████

███████████████████████████ NPD relies on language in the Agreement stating that ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ (Agmt. § 1.5 (emphasis added).)

NPD relies on *Golub Capital, LLC v. NB Alternatives Advisers LLC*, in which the court rejected a similar argument that a merger would "automatically breach" a ██████ confidentiality provision.  2022 WL 540653, at *12 (S.D.N.Y. Feb. 22, 2022).  In *Golub*, after the plaintiff revealed protected information, the defendant announced that it would spin-off an investment fund and merge it with plaintiff's competitor.  *Id.* at *5.  The *Golub* court denied the plaintiff's request for an injunction and dismissed the complaint.  In doing so, *Golub* embraced the principle that a mere merger is not, without more, sufficient to breach a contractual duty to "keep all information strictly confidential" where the NDA had "expressly contemplated that the 'Recipient' can be controlled by, or under common control with, another entity without affecting its . . . attendant rights and obligations under the NDA" and where a contrary view "would rewrite the parties' agreement." *Id.* at *12.

Relying on *Golub*, NPD argues that ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████ *Cf. id.* at *8 (holding that an NDA providing that only a contractual "Recipient" of confidential information could use proprietary IP was not violated by a merger because "Recipient" could refer to either the pre- or post-merger entity).

NPD may be right in its reading of *Golub*, but procedural and factual distinctions mean the same disposition is not warranted in this case at this juncture.  Importantly, in that case, the

plaintiff did not also raise a separate theory of contractual breach ██████████████ ████████████ *Golub* is solely a non-disclosure case.[2]  But here Nielsen argues that ████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████ and NPD is in breach of its duty not to ████████████████████████████████████

Thus, Nielsen's second theory of breach is that NPD's merger with IRI will result in a ██████████████████████████████ which provide that ████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████ (Agmt. § 1.2.) And if NPD is correct in its explanation of why it ████████████████████████████ ████████████████████ then NPD may yet be ██████████████████████████████ ██████████████████████████████████████████

In the recent case *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Group Inc.*, 68 F.4th 792 (2d Cir. 2023), the Second Circuit interpreted exclusivity and noncompete provisions ██████████████████████, and the court came down in a manner largely consistent with Nielsen's theory of breach of ████████████████████████████ There, the defendant

---

[2] *Golub* is further distinguishable because it concerned proprietary trading funds that the plaintiff and defendant created as a part of a joint asset management venture, but which they never formally incorporated as separate business entities.  *Id.* at *1.  The key fact, then, was that the *Golub* defendant signed a partnership agreement "on behalf of" the funds expressly.  *See id.* at *1 – 2.  Here, ████████████████████████ rendering the situation less clean.  Thus, while NPD is correct that *Golub* rejected the idea that a merger could "automatically breach" ████████████████████ when a more specific provision of the instrument "expressly contemplate[ed] that the 'Recipient' can be controlled by, or under common control with, another entity without affecting its . . . attendant rights and obligations," *Golub* does not *categorically* reject merger liability based on ████████ ████████████████████████  *See id.* at *10 (giving examples of alternative facts, such as absence of language in agreement binding non-signatories as in this case, which could have changed the outcome).

signed a contract in which it "agreed not to use[] [plaintiff's] intellectual property other than

providing the Services under the agreement. . . . Those 'Services' are only ones that [plaintiff]

subcontracted with [defendant] to provide.  [Defendant] similarly agreed . . . not to use or

disclose Information without [plaintiff's] prior consent."  This part of the contract also

specifically included "a non-compete provision that prohibited [defendant] from . . . competing

with [plaintiff] for [specified] contracts."  *Id.* at 804.  Similarly, the FAC alleges that Nielsen

 (FAC ¶ 65 –

66.)  This set of allegations is consistent with the inference drawn in *Syntel*, which held that it

was "fanciful to suggest . . . that [a party] would authorize [its counter-party] to use its trade

secrets to compete for business without saying so" expressly because it is implausible here to

believe that "the parties . . . would alter fundamental aspects of their contractual relationship in

vague terms or through catch-all provisions" like                              .  *Syntel*, 68 F.4th at

806.  That same inferential pattern supports the plausibility of Nielsen's allegations.  *See id.* at

805 ("[NPD]'s view of the [Agreement] . . .

(emphasis in original)).

     The converse is also true, in that NPD's responses to Nielsen's allegations of breach of

                          expose some tension with NPD's responses to

.  On the                   , NPD argues that Nielsen fails to allege breach of the

(Def. Br. at

21.)  This argument, however, is potentially in tension with NPD's defenses to breach of the

████████████████████████████████████████████████████

        This tension reflects contractual ambiguity making these issues inappropriate for

resolution on the present motion to dismiss.  NPD argues that if there were ambiguity, then it

could pertain only to ███████████████████████████████████████████████████

████████████████████████████████  (Agmt. § 1.5.)  But further

ambiguity lies elsewhere.  The Agreement also provides ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████  (Agmt. § 1.2 (emphasis added).)  █████████████

████████████████████████████████████████████████

████████████████████████████████  The Agreement is

ambiguous on this point.  While the next sentence of ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████  And ████████████████████████████

████████████████████████████████  NPD's construction,

moreover, reads the phrase in isolation from the rest of the Agreement, which ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████  (Agmt. §§ 1.1, 1.2.)  These contractual

ambiguities preclude resolution of this dispute on a motion to dismiss.  *See Info. Superhighway,*

*Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 470 – 71 (S.D.N.Y. 2003).



To be sure, as the Court observed in connection with the preliminary injunction motion, Section 1.5 of the Agreement ██████████████████████████████████████████████ ████████████████████████████████████████████████ (ECF No. 137 at 18.) Given this provision, the Court found Nielsen unlikely to succeed on the merits of its claim that NPD had ████████████████████████████████ As the Court explained, this claim is particularly weak to the extent that it rests solely on ██████████████████ ████████████████████████████████████████████████ ████████████████████████████ (*See* ECF No. 137 at 18 – 19.)  Even given the Court's view of the better reading of Section 1.5, however, dismissal of Nielsen's contract claims is not warranted at this stage due to ambiguities and the need for discovery.  Potential ambiguities include contractual ambiguities — such as the scope of ██████████████ ████████████████████████ and how those terms relate to ████████████████████ ██ — as well as factual ambiguities — such as what items were ████████████████████ ██████  There is also potential ambiguity in how the ████████████████████████████ ████████ of the Agreement relate ██████████████████████████

NPD argues that the bespoke ████████████████████████ in the Agreement ████████ ████████████████████████ resolves any ambiguity because it shows that ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████ (Def. Br. at 5 (citing Agmt. § 5.1.)  But this argument fails to justify dismissal at this early stage of the litigation.  Rather, it is merely an argument supporting one of multiple plausible interpretations of an ambiguous term based on reading the contract as a whole.

There is similar potential ambiguity in the ████████████████  That provision ████████████████████████████████████████████████████████████ (Agmt. § 1.2.) ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ (Pl. Opp. at 11; Def. Br. at 15.)  Here, too, NPD may have the better reading of the Agreement.  But the contractual language is not unambiguous.  Moreover, Nielsen does allege with sufficient particularity that NPD has informed Nielsen of its intent to ████████████████████████████████████. (FAC ¶¶ 106 – 08, 116 – 17.)  There remain interpretive issues involving the precise scope of these contractual provisions and how they interrelate in the context of the merger here.

Nielsen's claim that NPD independently breached Section 3 of the Agreement, however, must be dismissed for failure to state a claim.  Nielsen claims that NPD breached a separate, freestanding obligation ████████████████████████████████ (Opp. at 13 – 14.)  But this mischaracterizes Section 3, ████████████████████████████████████ ████████████████████████████████████████████████ (Agmt. §§ 3.1 – 3.5.)  The FAC does not allege which one of such goals is implicated in this case such that it permits Nielsen, ████████████████████████████████████ ████████████████████████ (FAC ¶¶ 171 – 79, 206 – 08.)  Instead, the only fact pleaded to support this theory of liability is that Nielsen purportedly "never" would have entered into the initial contract had it not ████████████████████████ (FAC ¶¶ 65, 66.)  It is well established, however, that "a court interpreting a contract is to give effect to the intent of the parties as revealed by the language of the agreement," not based on one party's post-hoc representations regarding its subjective beliefs at formation.  *Compagnie Financiere de CIC*

*et de l'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 232 F.3d 153, 157 (2d Cir. 2000).  The Section 3 portion of the contract claim, therefore, fails to state a claim.  The remainder of Nielsen's contract claims survive.

### B.    Implied Covenant of Good Faith and Fair Dealing Claim (Claim 4)

Nielsen argues that even if NPD did not breach the Agreement *per se*, NPD still violated the implied covenant of good faith and fair dealing, which is a non-contractual duty arising in equity under New York law.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)).  NPD responds that this claim must be dismissed because "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id*. (alteration omitted) (quoting *Harris*, 310 F.3d at 81).

Nielsen's claim, however, is not that NPD acted in bad faith in the bargaining process or in performing its ReceiptPal-related obligations during the course of the partnership.  Rather, Nielsen alleges that NPD's post-partnership conduct ███████████████████████

████████████████████████████████████████████████████

████████████ (Opp. at 16; *see also* FAC ¶¶ 171 – 77.)  NPD's arguments are nonresponsive because they presume this claim is pleaded in the alternative, but, read in the light most favorable to Nielsen, the implied covenant claim is focused on NPD's conduct that would *not* be covered by the Agreement, so New York's rule against duplicative pleading does not apply.  Nielsen's claim is that "[f]or the past nine months" NPD has been engaged in a project of deception, meant to prevent Nielsen from ███████████████████████████

████████ (Pl. Opp. 18; *see also* FAC ¶¶ 104 – 08, 116 – 24.)

The Court concludes that Nielsen's implied covenant of good faith and fair dealing claim is sufficiently alleged and survives the motion to dismiss.  *See Khan v. Laninver United States*, 2021 WL 1740293, at *5 (W.D.N.Y. Mar. 31, 2021) (rejecting motion to dismiss good faith and fair dealing claim and holding that a claim of one party's intentional subversion of a contract could be brought as a stand-alone claim for violation of the implied covenant of good faith and fair dealing under New York law).

### C.     DTSA and Trade Secret Misappropriation Claims (Claims 5, 6)

The Court next considers Nielsen's DTSA claim and parallel claim under New York common-law for trade secret misappropriation.[3]  "The DTSA provides a private cause of action to the 'owner of a trade secret that is misappropriated.'  There are, therefore, two components to a violation: the existence of a trade secret and its misappropriation."  *TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, 2022 WL 195836, at *4 (S.D.N.Y. Jan. 21, 2022) (quoting 18 U.S.C. § 1836(b)(1)).  NPD contests the adequacy of the complaint as to both components.  The Court addresses each in turn.

### 1.     Trade Secret Element

To be a "trade secret," the information at issue must meet three requirements.  First, a plaintiff must establish that it is a sufficiently specific "trade secret," which covers "all forms and types of financial, business, scientific, technical economic, or engineering information."  18

---

[3] The Court need not consider the common-law trade secret misappropriation separately from the federal DTSA claim.  If Nielsen states a DTSA claim, then it also states a claim for common-law misappropriation, as recognized by the New York courts, and *vice versa*.  There is no salient difference between the two claims because "[t]he elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim, and for that reason, "courts have found that a '[c]omplaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law.'"  *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019)).

U.S.C. § 1839(3).  There are two additional requirements meant to distinguish trade secrets under the Act from mere confidential information.  "First, the owner must have 'taken reasonable measures to keep such information secret . . . .  Second, the information must 'derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.'"  *Rodney v. United Masters*, 2023 WL 2184865, at *3 (E.D.N.Y. Feb. 10, 2023) (quoting 18 U.S.C. §§ 1839(3)(A) – 1839(3)(B)) (citing *Turret Labs USA, Inc. v. CargoSprint, LLC*, 2021 WL 535217, at *4 (E.D.N.Y. March 2022) (summary order)).  A court's "'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'"  *Catalyst Advisors, L.P. v. Catalyst Advisors Investors Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022) (quoting *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 421 (S.D.N.Y. 2021)).  "Though the question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss, courts dismiss claims involving trade secrets where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known."  *Catalyst*, 602 F. Supp. 3d at 672 (citing *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020)).

### a. Specificity of Secrets Alleged

To plead that a "process, design, or operation constitutes a trade secret, a party must describe the trade secret with 'specific and concrete information,'" not vague generalities.  *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 Fed. App'x 46, 48 (2d Cir. 2018) (quoting *Engleman v. David McKay Co.*, 422 N.Y.S.2d 95, 96 (1st Dep't 1979)).

NPD argues that Nielsen fails to allege a specific secret (Def. Br. at 20) because when pieces of information are "'readily obtainable in the industry,' they [would] not constitute trade secret[s]." *Catalyst*, 602 F. Supp. 3d at 673 (quoting *24 Seven, LLC v. Martinez*, 2021 WL 276654, at *9 (S.D.N.Y. Jan. 26, 2021)). But the FAC adequately alleges secret information not readily obtainable in the industry. "The NielsenIQ proprietary . . . information . . . shared with NPD and at issue in this action do[es] not concern improvements to the ReceiptPal application or ReceiptPal technology (e.g., its underlying source code), but instead concern[s] ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (FAC ¶ 79.) These secrets allegedly derive from "NielsenIQ's decades of experience in the CPG industry . . . ." (*Id.* (emphasis added).)

The allegations "suggest[] that the information . . . was unavailable or unknown to employees or others outside of the business, that it invested significant resources in developing these materials, or that this information gave it an economic leg up 'over competitors who do not know or use it'" or "allege [a defendant] used 'improper means to obtain the[] materials.'" *24 Seven*, 2021 WL 276654, at *9 (first quoting Restatement (First) of Torts § 757 cmt. b (1939); then quoting *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 462 (S.D.N.Y. 2017)).

The FAC details fourteen claimed secrets with specificity, 



(FAC ¶ 81; *see also* FAC ¶ 239.)  Nielsen further alleges that it ███████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  (FAC ¶ 82.)  Thus,

"ReceiptPal's collection of data and the resulting data [are] now the product of Nielsen's

confidential and trade secret information, although the application itself is not."  (FAC ¶ 87.)

In the Court's preliminary injunction opinion, it ████████████████████████████

████  and as noted above, the Court remains doubtful that this theory is supported by the

contractual language.  But the trade secrets alleged in the FAC are ██████████████████

████████  they include trade secrets about █████████████, which are pleaded

specifically.  And Nielsen adequately explains for all 14 secrets how this expertise slowly

derived from decades of ████████████████████████████████. The FAC disclaims

████████████████  as to those 14 trade secrets.

The *Syntel* case is also instructive regarding Nielsen's DTSA claim.  *Syntel* considered

similar licenses to proprietary software and data, and it also considered a similar merger by one

party with a competitor.  The Second Circuit held that "a reasonable jury could have determined

that the asserted software trade secrets were in fact trade secrets" and were identified with

specificity where a party "identified the trade secrets by name, described them in detail, tied

them to specific documents or source code, and communicated that [plaintiff] kept them

confidential."  *Syntel*, 68 F.4th at 13; *see also id.* at 14 (detail sufficient when a party "identified

. . . [the] tools trade secrets by name, described them in detail, tied them to specific documents or

source code, and . . . that [plaintiff] kept them confidential.").  Here, Nielsen identifies the

alleged trade secrets with specificity comparable to that approved in *Syntel*.

### b.    Reasonable Measures

To be a "trade secret," the statute also requires that an owner undertake reasonable

protective measures to safeguard the information.  Under the DTSA, it "'is axiomatic that a

plaintiff cannot recover for misappropriation of a trade secret if he revealed that secret' to the

world."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, --- F. Supp. 3d --- (2023), 2023 WL 2711417,

at *32 (S.D.N.Y. March 30, 2023) (quoting *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495,

518 (S.D.N.Y. 2017)).  And while "[t]he Second Circuit has yet to construe the term[]

'reasonable measures[]' for purposes of the DTSA in a precedential opinion," generally

speaking, "the reasonableness of any protective measure is a case-specific inquiry and a question

of fact."  *Better Holdco*, 2023 WL 2711417, at *32 (gathering cases).

Nielsen has met its pleading burden as to reasonable measures.  It identifies the

techniques it used to maintain secrecy.



(FAC ¶ 93.)  Nielsen further alleges

that it

(FAC ¶ 249.)

(*Id.*)  Nielsen alleges

(*Id.*)

### c.    Independent Economic Value

To be a "trade secret," the information must derive "independent economic value" from

its secrecy.  *See* 18 U.S.C. § 1839(3)(B).  The economic value prong can be satisfied when an

important competitor could achieve a marketplace advantage using the information.  *See DFO Glob. Performance Com. Ltd. (Nev.) v. Nirmel*, 2021 WL 3475596, at *4 (S.D.N.Y. Aug. 6, 2021) (information about "products in [p]laintiffs' pipeline, [its] vendor information, and the sales volume and profitability of [its] offerings" could in some circumstances constitute a protectable trade secret since "[a] competitor with access to the information could bypass an expensive trial-and-error process to determine which products to stock, what pricing schemes to use, and how many units to order and from whom").

The FAC alleges that ██████████████████████████████████████████ ██████████████████████████████████  (FAC ¶ 7.)  The FAC further describes the competition between NielsenIQ and IRI, the two dominant firms in the CPG market, illustrating that, if disclosed, the information at issue ████████████████████████ ████████████████████  (FAC ¶ 74; *see also* FAC ¶¶ 6, 57, 63.)  Therefore, the FAC sufficiently alleges independent economic value from secrecy of the 14 secrets at issue. *See Better Holdco,* 2023 WL 2711417, at *31 (quoting *Chevron U.S.A., Inc. v. Roxen Serv. Inc*., 813 F.2d 26, 29 (2d Cir. 1987).

### 2.      Misappropriation Element

The DTSA also requires a second element: misappropriation.  "To plead misappropriation . . . under the DTSA, a plaintiff must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."  *MedQuest Ltd. v. Rosa*, 2023 WL 2575051, at *3 (S.D.N.Y. March 20, 2023) (internal citations omitted).

The implication of this is that there are "three theories of liability: [i] acquisition, [ii] disclosure, or [iii] use." *Integro USA, Inc. v. Crain*, 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019). All three theories require a breach of a predicate legal duty not to disclose (typically provided by contract or statute). *See Island Intell. Prop.*, 463 F. Supp. 3d at 500 n. 3; *Golub*, 2022 WL 540653, at *12. Possession of a trade secret alone is never enough, even when continued possession is wrongful or a defendant "threaten[s] to keep trade secrets." Rather, the complaint must allege that the defendant also "threaten[ed] to disclose them." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 405 (S.D.N.Y. 2021). Use, including disclosure, of a trade secret that is authorized by a contract is also not misappropriation. *See TransPerfect*, 2022 WL 195836, at *5 – 6; *see also Golub*, 2022 WL 540653, at *12 – 13.

The FAC plausibly alleges that this merger could itself be, or will necessarily result in, misappropriation. Courts recognize that "misappropriation includes circumstances in which a person 'at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." *Catalyst*, 602 F. Supp. 3d at 676 (quoting 18 U.S.C. § 1839(5)). Here, however, the question of whether NPD had the requisite knowledge of a duty against disclosure is determinative of liability. The answer turns on both factual and legal inquiries into ████████████████████████████████████████████ ████████  Because the other DTSA elements are met,████████████████████ ██████████████████████████████████████████████████████

NPD, relying primarily on *Golub*, argues that a merger cannot be misappropriation under the Act, reading that case to say that there is no basis in the law or the contract to conclude that "a *permitted* merger of two companies effects a 'disclosure' by one to the other." (Def. Br. at 13

(citing *Golub*, 2022 WL 540653, at *5 – 7 (emphasis added)).  The Court has addressed *Golub*

above.  For purposes of DTSA misappropriation, it suffices to say that NPD's argument works

only if the merger with IRI ███████████████████████████████████████████████

████████████████████████████████████████████ And it is premature at the pleadings stage

for the Court to definitively resolve the related contract interpretation questions.  The Court

concludes that the FAC states a claim for trade secret misappropriation under the DTSA.  *Cf. Inv.*

*Sci., LLC v. Oath Holdings Inc*., 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021).

       **3.**      **Motion for a More Definitive Statement**

Alternatively, NPD argues that the "Court should order Nielsen[] to provide a more

definite statement" because Nielsen pleaded merely "14 general categories—within which

Nielsen alleges it owns unspecified trade secrets that are somehow ███████████████—

present hopelessly vague allegations . . . ."  (Def. Memo at 25 (quoting FAC ¶ 54).)  NPD argues

that it "needs . . . actual identifying information about the alleged information at issue to defend

itself . . . ."  (*Id*.)

Under Federal Rule 12(e), a court should order a plaintiff to provide a more definitive

statement where the pleading does provide some degree of notice regarding a claim "but does not

contain sufficient information to allow a responsive pleading to be framed without risk of

prejudice."  *Agilent Techs., Inc. v. Micromuse, Inc.*, 2004 WL 2346152, *4 (S.D.N.Y. Oct. 19,

2004).  Depending upon how this case proceeds, as the record in this case develops, Nielsen will

need to develop facts buttressing and fleshing out its fourteen alleged types of trade secret

information.  But at this early stage in the litigation, Nielsen's allegations provide sufficient

notice to NPD as to the trade secrets at issue.   Accordingly, the motion in the alternative for a

more definite statement is denied.

### D.      Common-Law Unfair Competition Claim (Claim 7)

Nielsen also alleges a violation of New York business tort law of unfair competition. This claim is dismissed as duplicative of the claims based on the parties' Agreement.  The Agreement's purpose was to allocate risks, duties, and rights, including with regard to the

████████████████████████████████████████████████████████  It is well established that the "existence of valid contracts" with specific terms governing ███████████

███████████  precludes a separate cause of action for unfair competition in New York.  *See ScentSational Techs., LLC v. PepsiCo, Inc.*, 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017) (collecting cases).  The unfair competition claim is thus duplicative of Nielsen's contract claims and dismissed for that reason.

## IV.   Conclusion

For the foregoing reasons, NPD's motion to dismiss the First Amended Complaint is GRANTED in part and DENIED in part.

Defendant shall file an answer within 21 days after the date of this opinion and order.

The parties shall, within 14 days, confer and submit a redacted version of this opinion and order to be filed publicly on ECF.

The Clerk of Court is directed to close the motion at Docket Number 98.

SO ORDERED.

Dated: August 28, 2023
       New York, New York

J. PAUL OETKEN
United States District Judge