## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIELSEN CONSUMER LLC d/b/a NIELSENIQ,<br><br>Plaintiff,<br><br>v.<br><br>CIRCANA GROUP L.P.,<br><br>Defendant. | Civil Action No. 1:22-cv-3235-JPO<br><br>**REDACTED<br>SECOND AMENDED<br>COMPLAINT**<br><br>**FILED UNDER SEAL<br>HIGHLY CONFIDENTIAL** |

Plaintiff Nielsen Consumer LLC d/b/a NielsenIQ ("NielsenIQ" or "Plaintiff"), by and

through its attorneys, hereby submits this Second Amended Complaint against Defendant

Circana Group, L.P. ("Circana" or "NPD" or "Defendant") as follows:

## INTRODUCTION

1.      This case arises out of NPD's breach of contract, misuse and misappropriation of

NielsenIQ's confidential and proprietary information and trade secrets, breach of good faith and

fair dealing, and its effort to engage in unfair competition.

2.      NielsenIQ invested direct funding into NPD, as well as years of internal financial

resources and contributed proprietary and confidential information, know-how, and trade secrets

to enable NPD to expand its mobile application called ReceiptPal into a viable consumer

packaged goods ("CPGs") data ("████████████") collection engine.[1]

---

[1] The term ███████████████████████████████████████████ A true and correct copy of
the Agreement is attached hereto as **Exhibit A** and incorporated herein by reference. A true and correct copy of the
parties' Amendment No. 1 to the Agreement (the "Amendment") is attached hereto as **Exhibit B** and incorporated
herein by reference.

3. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████ .

4.      Beginning in or around January 2022, NPD sought to expand its consumer panel

relationship with NielsenIQ.  When NielsenIQ declined the expansion proposal on the terms

presented by NPD, NPD threatened to license CPG Licensed Data from a "shadow-panel," made

up of reserve panelists, to NielsenIQ's competitors.  NPD's threatened actions would violate

NielsenIQ's exclusive rights to this data and reveal NielsenIQ's confidential information and

intellectual property, which was relied on to collect and develop this CPG Licensed Data – which

therefore embodies NielsenIQ's confidential and proprietary intellectual property

5. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ .

6.      More recently, on April 7, 2022 – and after months of dissembling and misleading

NielsenIQ about its plans – NPD announced that it had formally agreed to merge with

NielsenIQ's most aggressive competitor, Information Resources Inc. ("IRI").

7. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████ .

8.    Moreover, over the course of the parties' relationship, NPD has acted in bad faith under the auspices of collaborating with NielsenIQ to improperly gain access to NielsenIQ's trusted investments and proprietary information related to the CPG industry.  NPD now seeks to unjustly and unfairly gain from this disclosure by improperly providing this confidential information and trade secrets to IRI.

9.    In this action, NielsenIQ seeks to protect its contractual exclusivity rights, trade secret and confidential information and know-how, and intellectual property rights, including by obtaining injunctive relief, as well as a separate award for money damages in an amount to be specifically determined at trial.

## PARTIES

10.    Plaintiff-Counterclaim Defendant NielsenIQ is organized and existing under the laws of Delaware and has its principal place of business at 200 W. Jackson Blvd. Chicago, IL.

11.    NielsenIQ is a stand-alone company formed from Nielsen Holdings Inc.'s Global Consumer Business Group.  Since 1923, NielsenIQ (and its predecessor group) have provided businesses with data and analysis to help them make shopper-centric decisions with a complete picture of consumer habits and trends, refine product assortment and availability to the correct consumer segments, identify avenues for revenue growth to bring more competition to consumer markets, and streamline how information is shared across systems to drive collaboration.

12.    Defendant-Counterclaimant Circana, which is the combined entity resulting from the combination of IRI and The NPD Group, is organized and existing under the laws of

Delaware and has its principal place of business at 900 West Shore Road, Port Washington, NY 11050.

13.    Circana is a market research company that provides market information and advisory services for general merchandise.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over NielsenIQ's trade secret claims pursuant to 28 U.S.C. § 1331.

15.    This Court has supplemental jurisdiction over NielsenIQ's state-law claims pursuant to 28 U.S.C. § 1367 because the claims are related to claims over which this Court has original jurisdiction such that they form part of the same case or controversy with those claims under Article III of the Constitution.

16.    This Court has personal jurisdiction over Defendant Circana because Defendant Circana is domiciled in the state of New York and because Section 13.6 of the Agreement provides that "[a]ny disputes will ultimately be settled in courts located in New York, New York."

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because Section 13.6 of the Agreement provides that disputes between the parties "will ultimately be settled in courts located in New York, New York."

## FACTUAL BACKGROUND

### A.    The Consumer Packaged Goods Market

18.    NielsenIQ provides manufacturers and retailers with data and tools that help them understand consumer behavior in their markets and use that knowledge to grow their businesses.

19.    Specifically, NielsenIQ collects and licenses market sales and consumer information to retailers and manufacturers of CPGs.  CPGs are products that consumers

frequently use and replenish, including, for example, grocery items (e.g., produce, meat, seafood, dairy), household care items, pet supplies, and health or beauty items.

20.    NielsenIQ uses consumer panels to collect consumer shopping data.

21.    A consumer panel is a method of gathering ongoing data from shoppers in which market researchers collect purchasing data directly from a group of shoppers, referred to as "panelists," to gain insight into their attitudes, behaviors, and purchasing habits.

22.    The data collected in a consumer panel creates many data points including, but not limited to, consumer demographics, how much they purchase, what brands they consider, how often they shop, what percentage of them buy a certain product, and what brands they buy repeatedly.

23.    NielsenIQ uses the data it collects and creates to help brands and companies better understand consumer behavior and how that behavior drives product sales and purchasing trends. NielsenIQ has historically distinguished itself in the consumer analytics market by leveraging its proprietary techniques, information, and technology to minimize data "gaps" – that is, missing information on consumers and their purchases – and build panels that collect complete and accurate data.

24.    Minimizing data gaps is particularly critical to customers in the market research industry who consider what gaps exist when making purchasing decisions from market research firms.

25.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
███████.

26.     For over thirty years, NielsenIQ has operated a Homescan Consumer Panel, in which ongoing data is gathered from panelists by having them manually scan barcodes of all their purchases to collect and analyze CPG data.

27.     In 2010, NielsenIQ and IRI formed a joint venture called the National Consumer Panel, in which panelists either scanned barcodes of purchases using a handheld barcode reader or a mobile application with a barcode reader to collect CPG data.

28.     While this meant that the two companies shared the carrying costs for the panel, it also meant that both had access to the same CPG data, so differentiation between the companies was limited to the quality and consistency of the services provided and each company's ability to add supporting analytics for users to better understand the data and the impacts they may have on consumer purchasing habits.

29.     In addition, the method of manually scanning data could not track online purchases.

30.     In 2014, NielsenIQ began looking into ways to obtain additional unique data sets and for less burdensome ways to collect online receipts, which was particularly important given the increasing prominence of e-commerce.

31.     NielsenIQ developed ShopTracker, a mobile application that allowed NielsenIQ to collect consumer purchase data from a participating consumer's Amazon.com account.

32.     Around this same time period, NielsenIQ also began looking into partnering with NPD, a market research company that collected and licensed market sales and consumer information including point-of-sale data, consumer surveys, and consumer receipts.

33.     NPD focused on collecting raw data, reflecting purchases by consumers through its ReceiptPal mobile application, which allowed users to take photos of receipts inside and outside of the home.

34.     NielsenIQ was interested in partnering with NPD on the development of ReceiptPal.

35.     █████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

36.     Among other issues, the composition of ReceiptPal's panel, from which NPD collected data, was flawed and undermined the value of both the data generated and any market research products or services that relied on this data.  This was because ReceiptPal was not designed to comprehensively track CPG purchases or to build CPG market research products or services.

37.     At this time, the panel had only 30,000 panelists, which was too few to provide reliable or marketable data, and the panel was not demographically representative, among other issues.

38.     In addition, ReceiptPal was not collecting essential, value-driving, and complete information on consumer purchases – for example, it failed to collect information about certain online and subscription-based purchases – causing other significant data gaps, which was a major impediment to doing business in the CPG space.

39.     █████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

**B.**      **NielsenIQ and NPD Enter Into an Exclusive License for NielsenIQ to Use CPG Licensed Data**

40.  ████████████████████████████████████████████

████████████████████████████████████████████████

41.  ████████████████████████████████████████████

████████████████████████████████████████████████

42.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

43.  ████████████████████████████████████████████

████████████████. *See* ECF No. 84 at 17 (stating that "here, there is no dispute about the validity

of the contract.").

44.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

45.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. *See* Agreement, at 1.

46.  The Amendment also provides that ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

However, in order to ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

*See* Amendment § 4(e).

47.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

48.    ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

49.    ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████.

50.    ████████████████████████████████████████████████████████████

██████████████.

51. ███████████████████████████████████████████████████

███████████████████████████████. *See, e.g.*, Agreement §§ 2.1-2.2.

52. ████████████████████████████████████████████████████████

████████████████████████. *Id.*

53. ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████ *See*

Agreement § 3.

54. ██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████.

55. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████.

56. ████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████.



58.    NielsenIQ also revealed other proprietary trade secret and confidential information as part of the collaboration with NPD.  To protect the disclosure and use of this information, the parties ████████████████████████████████████████.  *See, e.g.*, Agreement §§ 6.1, 7.2, 7.5. ███████████████████████████████ ███████████████████████████████████████████.  Agreement § 7.2. ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████.  Agreement § 7.2.

59.    For example, NielsenIQ revealed proprietary trade secret and confidential information on ████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████.

60.    Prior to NielsenIQ's involvement, NPD did not even know that this information should be collected.

61.    This confidential and proprietary information is extremely sensitive in the consumer data industry – it is precisely how competitors differentiate themselves.

62.    For example, NielsenIQ had experience and expertise in this area due to its own mobile application, ShopTracker, which collects consumer purchase data from a participating consumer's Amazon.com account.

63. █████████████████████████████████

████████████████████████████████

██████████████████████████████. *See*

Agreement § 1.2 (███████████████████████████████

███████████).

64.     Because other competitors in the market, including NielsenIQ's direct competitor, IRI, have not developed comparable capabilities to collect and analyze online receipts, the CPG Licensed Data would be an enormous differentiator in the market and provide significant value to NielsenIQ customers.

65. ████████████████████████████

█████████████████████████████████

████████████████.

66.     On information and belief, NPD was aware that NielsenIQ would not have entered into the Agreement absent the exclusivity or confidentiality obligations put in place to protect NielsenIQ's confidential and trade secret information.

67. ████████████████████████████████

██████████████████████████

███████████████████████████

████████████████████████████

█████████████████.

68. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

69.     ██████████████████████████████████████

████████████████████████████████████████████.  Such

products, which rely on ██████████████████████████, are highly

profitable and are core to NielsenIQ's business.

**C.     NielsenIQ's** ████████████████████████ **Sold in NielsenIQ Channels**

70.     Pursuant to the Agreement, NielsenIQ has ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ Agreement,

Appendix A § 2(a).

71.     ████████████████████████████████████ *See*

Agreement, Appendix A § 2(c).

72.     The term ████████████ is not defined anywhere in the Agreement.

73.     Moreover, the term is ambiguous, particularly given the ever-changing

marketplace and the lack of any industry standard defining the term.

74.     Given the ambiguity, the parties specifically agreed that ████████████

████████████████████████████████████████.

75.    In advance of NielsenIQ's first product launch in October 2021, NielsenIQ provided NPD with ████████████████████████████████████████████ ██████████████████████████████. NielsenIQ informed NPD that it ████████████████████████ ████████████████████████████████████████████████████████████.

76.    NielsenIQ further met with ████████████████████████████████ ████████████████████████████████████████████████████.

77.    NPD expressly agreed to ████████████████████████████████ ████████████████████████████.

78.    The Parties' course of performance since entering into the Agreement has established ██████████████████████████████████████████████████████ ████████████████.

79.    Specifically, the course of performance between the parties makes clear that ██ ██████████████████████████████████████████████.

80.    Indeed, throughout the course of the Parties' relationship, NPD has been fully aware of ████████████████████████████████. For example, following ████████████████████████████ NielsenIQ twice more provided NPD with a ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. These lists contained detailed specifications of ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.

81.    NielsenIQ continued to ████████████████████████████████ ████████ without any objections from NPD.

82.    However, following NPD's merger with NielsenIQ's direct competitor, IRI, Defendant made a complete 180 degree turn, claiming for the first time that ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

83.    Defendant's newly-fashioned ████████████████████████████ ███████████████████████████████████████████████████ ████████████████████. Defendant's sudden change in position is nothing more than a transparent attempt to harm NielsenIQ's business for Defendant's benefit.

84.    Despite Circana's baseless allegations, NielsenIQ remains in full compliance with the Agreement.

**D.    The Explicit Provisions of the Agreement That Ensure the ████████████ ████████████████**

85.    NielsenIQ specifically bargained for various provisions that would ensure the ████████████████████████████████████████████████████████ ████████████.

86.    Specifically, the Service Level Agreement, appended to the Agreement, expressly prohibits ████████████████████████████████████████ ████████████████████████████████. *See* Service Level Agreement § 4(b).

87.    ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████ ██████████    *See* Agreement, Appendix A at § 3.  These required ████████████████████ ████████████████████████████████████████████████████ ████████████.  *See* Agreement, Appendix A at § 3.

88.     In addition to the Agreement's ██████████████████████████ ████████████, NielsenIQ further bargained for ████████████████████ ████████████████████████████. *See* Service Level Agreement, Appendix 2; Service Level Agreement, Attachment 2A.  For example, ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████. *See* Service Level Agreement, Attachment 2 at 2(a); Service Level Agreement, Attachment 2A.

89.     Attachment 2A to the Service Level Agreement outlines ████████████ ████████████████████████████████████████████████ *See* Service Level Agreement § 1.  For example, the ████████████████████████████████ ████████████████████████████. *See* Service Level Agreement, Attachment 2A.  Circana explicitly recognized that ████████████████████████ ████████████████████████████████████████████ ██████████████ *See* Service Level Agreement § 3.  If and when Circana ████████████ ████████████████████████████████████████████ ████████████████████ *Id.*

90.     The Service Level Agreement further ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ *See* Service Level Agreement § 3.a.3.1.  NielsenIQ is permitted to ████████████████████████████████. *See* Service Level Agreement § 3.a.3.1; Service Level Agreement, Attachment 2B.  The Service Level Agreement also provides that ████████████████████████████████████████

████████████████████████████████████████. *See* Service Level Agreement §

3.a.3.2; Service Level Agreement, Attachment 2B.

91.    Among other ████████████████████████████████████████

████.

92.    Provision § 6(a) of the Amendment also requires Circana to ████████████

████████████████████████████████████████████████████████

████. *See* Amendment No. 1 at § 6(a).

93.    Moreover, § 7(c) of the Amendment outlines ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████    *See* Amendment No. 1 at § 7(c).

**E.    The Explicit Provisions of the Agreement That Protect NielsenIQ's Intellectual Property and Confidential Information**

94.    ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.

95.    ████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

96. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ *See* Agreement § 7.5.

97. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████.

98. ████████████████████████████

████████████████████.

**F.**   **NielsenIQ Provides NPD with Confidential Proprietary Information and Know-How and Trade Secrets**

99. ████████████████████████████

████████████████████████████████████

████████████████████████.

100. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████



101. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████.

102. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████.

103.    Over the course of the four-year relationship with NPD, NielsenIQ shared much of its independently developed confidential proprietary and trade secret information with NPD. The NielsenIQ proprietary techniques, information, and technology shared with NPD and at issue in this action do not concern improvements to the ReceiptPal application or ReceiptPal technology (e.g., its underlying source code), but instead concern ████████████████████ ████████████████████ – all based on NielsenIQ's decades of experience in the CPG industry, including with its ShopTracker application.

104.    Altogether, the provision of NielsenIQ's confidential proprietary and trade secret information ensured (i) the collection of full, accurate, and reliable data that adds value from a data analytics and market research perspective and (ii) that a panel could be built to collect this data.  This is because data assessment and analysis can only be as good as the data collected.  If the data has gaps, inaccuracies, biases, or is not large enough to read trends from, analyzing and commercializing the data is of minimal value.  NielsenIQ was uniquely positioned to evaluate and address those issues given its preexisting expertise and know-how in the CPG market.

105.    

106.    For example, as part of the trade secret and confidential information shared with NPD, NielsenIQ ████████████████████████████████████ ████████████████████████████████████ ████████████████████. As another example, ████████████████████ ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████.

107.    NielsenIQ's trade secret and confidential information also relates to ████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████.

108.    Additionally, over the course of the parties' multi-year relationship, NielsenIQ

data scientists have disclosed ████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████. This information would be extremely valuable to a company such as IRI

who competes with NielsenIQ on data analysis.

109.    NielsenIQ has also revealed █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████. This

█████████████ is the result of substantial long-term investment and is some of the most

sensitive and proprietary information at NielsenIQ.

110.    As a final example, NielsenIQ shared ███████████████████████████ ████████████████████████████████████████████████████ ████████████████.

111.    Based on NielsenIQ's disclosure of its confidential and trade secret information, ReceiptPal currently collects ██████████████████████████████████ █████████████████████████████████. Thus, ReceiptPal's collection of data and the resulting data is now the product of NielsenIQ's confidential and trade secret information, although the application itself is not.

112.    Other NielsenIQ confidential and trade secret information, including at least ██ ████████████████████████████████████, is not literally used to collect data from ReceiptPal but was revealed to NPD to inform the collection of data and help NPD understand why certain data had to be collected.

113.    This confidential propriety and trade secret information was developed by NielsenIQ prior to its relationship with NPD and is based on NielsenIQ's experience in the CPG industry, including with its own mobile application, ShopTracker, as well as its other consumer panel products that have been on the market for many years.

114.    █████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ ██████████████████████.

115.    NielsenIQ's confidential and trade secret information shared with NPD is aimed at closing data gaps and assisting NPD in the collection of a comprehensive dataset.  All of

NielsenIQ's competitors, including IRI, face the same challenges of collecting this kind of comprehensive data. This is why NielsenIQ's confidential solutions to these problems, and its requirements that certain types of data be collected, would be useful and valuable information for IRI. This information derives economic value from its confidential status because NielsenIQ's competitors are unaware of NielsenIQ's proprietary solutions to industry-wide problems. Disclosure would deprive NielsenIQ of the competitive advantage it obtained through its own development of this information.

116.    NielsenIQ regards this information and know-how as highly confidential, proprietary, and trade secret, and carefully protects this material and know-how.



117.

118.

. *See* Agreement § 7.1.

119.

.

120. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████.

121. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████.

122. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████. *See* Agreement §§ 1.3.1, 1.3.2.

123. ███████████████████████████████████████

███████████████████████████████████.

124. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████.

125. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████.

G.    ███████████████████████████████████████

███████████████████████.

126.    In October 2021, after NPD was acquired by private equity firm, Hellman &
Friedman, the parties' relationship rapidly began to deteriorate.

127.    Armed with NielsenIQ's technical skills, information, experience, and know-how, NPD has reaped the rewards of the Agreement.  But NPD now seeks to misuse these gains at NielsenIQ's expense.

128.    Shortly after the NPD acquisition by Hellman & Friedman, and just as NielsenIQ was finally able to commercialize the CPG data, in January 2022, NPD demanded that NielsenIQ agree to pay NPD additional money to expand the size of the panel.

129.    NielsenIQ declined because it wanted to focus on launching the existing product. Given panelist turnover, NielsenIQ also understood that NPD would likely need to provide NielsenIQ with data from these "additional" panelists to ███████████████████████ ███████████████████████████████████.

130.    NPD then informed NielsenIQ in or around January 2022 that if NielsenIQ would not buy the CPG data from the additional panelists, then NPD would sell this "shadow panel" data to third parties, ███████████████████████████████████ ████████████████████████████████████████████████████████ ████.

131.    ████████████████████████████████████████████ ██████████████████.

132.    Thus, NPD claimed, it was free to generate additional data using the same tools developed jointly with NielsenIQ – ████████████████████████████ ████████████████████████████████████████.

133.    ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████.



134. ████████████████████████████████████████

████████████████████████████████████████████████████████

██ .

135. ████████████████████████████████████████

██████████████████████████████████████████ .

136. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ .

137.     Moreover, there is no practical distinction between the "shadow panel" and the regular panel as both are predicated on NielsenIQ's financial contributions and the sharing of NielsenIQ's confidential or proprietary information.

138.     Further, when panelists drop of out of a panel (and there is an approximately 30% turnover rate on an annual basis), ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████ .

139.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ .

140.    ████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ .

141.    ████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ .

## H.    **NPD's Planned Merger with IRI**

142.    In February 2022, NielsenIQ learned that NPD was in merger talks with IRI, NielsenIQ's direct and most significant competitor.

143.    ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████.

144.    In response, NPD refused to either confirm or deny whether it would merge with IRI, and, if so, how it would protect NielsenIQ confidential know-how and trade secret information or ensure that the CPG Licensed Data would not be used to compete with NielsenIQ.

145.    Instead, NPD argued that NielsenIQ's concerns were premature. ██████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████.

146.    However, upon information and belief, NPD was already significantly engaged in discussions with IRI to merge at the time NielsenIQ contacted NPD to request confirmation.

147.    ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████.

148.    ████████████████████████████████████████████████

███████████████████████████████████.

149.    On information and belief, NPD has shared the Agreement with IRI or other third parties, including as part of due diligence conducted as part of the contemplated NPD-IRI merger.

150.    On April 7, 2022, IRI and NPD publicly announced that the two companies were merging.

I.    **NPD's Threatened Misappropriation of NielsenIQ's Trade Secrets and Confidential Information**

151.    NPD's merger with IRI poses a threat of improper use of NielsenIQ's confidential and proprietary information and trade secrets, misappropriation of the trade secrets and confidential information, and breach of NPD's duty to maintain the confidentiality of NielsenIQ's confidential information.

152.    NPD knowingly and intentionally disregarded its obligations under the Agreement and NielsenIQ's warnings and proceeded to agree to a merger with IRI.

153.    The current resulting data from ReceiptPal is the product of and embodies NielsenIQ's proprietary confidential and trade secret information – whether CPG Licensed Data (including the "shadow panel" data) or non-CPG data.

154.    In merging with IRI, NPD has not agreed to provide any protection for *all* of NielsenIQ's trade secret and confidential information, including materials containing that proprietary information, and any protection offered is solely for the duration of the case. Without such protections, NPD will allow IRI to gain access to this confidential and trade secret information without NielsenIQ's authorization as well as other confidential and trade secret information reflected in documents and shared confidentially over the parties' relationship.

155.    As a result, by allowing IRI access to NielsenIQ's confidential and trade secret information, NPD will misuse NielsenIQ's trade secrets, confidential, and proprietary information to compete against NielsenIQ.

156.    This use or threatened use of NielsenIQ's confidential, trade secret, and proprietary information is in direct violation of the Agreement as well as NielsenIQ's reasonable expectation that NPD would honor its written and other assurances to use NielsenIQ's trade secrets, confidential, and proprietary information only as authorized by NielsenIQ.

157.    NielsenIQ's trade secrets, confidential, and proprietary information are threatened by NPD's merger with IRI, and NPD has not provided any assurances that it has and will take reasonable measures to protect NielsenIQ's information.

158.    In short, NPD's actions threaten imminent and improper use and disclosure of NielsenIQ's protected trade secrets and other confidential information to its direct competitor.

159.    Such disclosure will irreparably harm NielsenIQ.

**J.    IRI's Attempts to Develop a Panel That Tracks Online Purchases and Competes Directly with NielsenIQ**

160.    In recent years, IRI has repeatedly and improperly sought avenues to catch up with NielsenIQ's more advanced and accurate consumer data offerings.

161.    For example, in May 2021, NielsenIQ learned that IRI was surreptitiously attempting to use the National Consumer Panel, the joint venture between NielsenIQ and IRI that shares data from panelists who manually scan barcodes of their purchases, to develop its own receipt panel that could more easily gather data on online purchases.

162.    IRI's attempt to create an additional panel was eventually revealed and halted because it violated its joint venture agreement with NielsenIQ, which does not allow either IRI or NielsenIQ to leverage the National Consumer Panel to create a stand-alone new panel for one party's sole use.

163.    Unable to unilaterally use the joint venture to create a panel that better tracks online purchases, IRI then acquired Coin Out Inc. ("Coin Out") in 2021.

164.    Like NPD, Coin Out has a mobile application that allows purchasers to take photos of their receipts after making purchases.

165.    However, Coin Out's application lacked key technological capabilities that ReceiptPal could deliver, such as the ability to capture receipt images and link to email and credentialed retailer accounts.

166.    Unlike NielsenIQ's significant investment in ReceiptPal, upon information and belief, IRI has not made a similar investment in Coin Out, and Coin Out lacks significant comparable functionality to ReceiptPal as a tool for CPG data collection.

167.    To date, IRI has been not been able to commercialize any data received from Coin Out.

168.    Having failed to unilaterally use the Joint Venture to create an application that could capture online purchases or develop and commercialize Coin Out, IRI now seeks, with the help of NPD, to merge and gain access to the technology and Licensed CPG Data developed with NielsenIQ's substantial investment, confidential information, and trade secrets.

169.    Upon information and belief, access to ReceiptPal's resulting data, which is the product of NielsenIQ's significant investment as well as its confidential information and trade secrets, and the corresponding ability to compete with NielsenIQ, are the reasons IRI now seeks to merge with NPD.

**K.     NielsenIQ Will Be Irreparably Harmed If NPD Shares the CPG Licensed Data or Uses It to Compete with NielsenIQ**

170.    If NPD is allowed to violate the exclusivity provision of the Agreement and use and disclose NielsenIQ's trade secrets, confidential, and proprietary information, then NielsenIQ will be harmed in a number of ways.

171.    Most obviously, NPD's merger and resulting violations of the Agreement will result in clear monetary damage that includes at least the exclusivity fee, the millions NielsenIQ spent in investments, and any lost sales as result of NPD's willful misconduct.

172.    However, NPD's failure to honor its contractual obligations and threatened misappropriation of trade secrets and confidential information will also harm NielsenIQ in ways that cannot be compensated merely by monetary damages.

173.    As a result of NPD's conduct, NielsenIQ is threatened with irreparable harm – significantly and in the long-term – including damage to its customer goodwill, industry relationships, and hard-earned market share as well as disclosure of its confidential information and trade secrets.

174.    Because IRI does not have similar capabilities to collect online receipts, the CPG Licensed Data will be a major differentiator for IRI in the market and will enable it to control certain market segments, such as "Beauty Goods" in both the "Prestige" category and the "Mass" categories.



178. ███████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████.

179. ████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████.

180. █████████████████████████████████████████
██████████████████████████████████████████.

181. ██████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
███████████████████████.

182. ██████████████████████████████████████
██████████████████████████████████████████.

183. ███████████████████████████████████████████
███████████████████████████████████
████████████████████████.

184. ████████████████████████████████████
███████████████████████████████████████.

185. ██████████████████████████████████████
██████████████████████████████████████████
██████.

186. 

187.

188.

189.

190.

191.

192.     As a result, NielsenIQ has been forced to bring this action to enforce its valuable confidential information and intellectual property rights and its Agreement with NPD.

**L.     NPD's Post-Complaint Conduct**

193.     Since NielsenIQ initiated this lawsuit in April 2022, NPD has engaged in a series of actions designed to harm NielsenIQ and its business expectancies.

194.    For example, since April 2022, ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

195.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

196.    ████████████████████████████████████████,

causing significant harm to NielsenIQ's business by preventing NielsenIQ from ████████

████████████████████████████████████████████

██████.

197.    As another example, ████████████████████████

████████████████████████████████████████████

████████████████████████████████.

198.    As an additional example, ████████████████████

████████████████████████████████████████████

████████████.

199.    Specifically, ████████████████████████████

████████████████████████████████████████████

██.

200.    Circana has also: ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████ .

201. ██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ .

202. ██████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ .

**M.**    **Circana Makes Changes to the** ████████████████████ **, in Breach of the Agreement**

203.    On August 1, 2022, NPD officially merged with IRI.

204.    Following the merger, Defendant's retaliatory misconduct designed to harm NielsenIQ's business has intensified—culminating in a critical disruption to NielsenIQ's core product.

205.    On May 15, 2023, Circana, the now combined NPD-IRI entity, informed certain NielsenIQ employees via a Trello communication that ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ .

206.    Upon information and belief, the in-house development and replacement of ████

█████████████ typically takes, *at a minimum*, three months to a year of planning prior to implementation.  Despite the telephonic meetings that occur between NielsenIQ and Circana every three weeks, the May 15, 2023 communication was the first time that Circana informed NielsenIQ of ███████████████████████ .

207.    Moreover, ████████████████████, the parties would have needed to engage in *months* of planning and coordination in order to avoid an adverse impact upon NielsenIQ's business.  In fact, when the parties had previously undergone ████████████████ ████████████████████████████████████.  Circana was well aware of the months of coordination that would be required between the parties before it ██████████████████.

208.    In response to Circana's message, NielsenIQ asked a number of questions about the impact that Circana's ████████████████████████ ████████████████████████████████████ ██████████████████.

209.    After waiting nearly two weeks to respond, Circana falsely informed NielsenIQ that ████████████████████████████████████ ██████████████████.  Given that Circana ████████████████████ ████ Circana was clearly aware that there would be ████████████████████████ ████████████████████████████████████ ████ at the time it made these false statements.

210.    Several weeks later, and only following NielsenIQ's repeated requests, Circana provided NielsenIQ with ██████████.  NielsenIQ sought this ████████████████ ████████████████████████████████████ ██████████████.

211.    When Circana finally provided ████████████████████████ ██████████████—despite Circana's assurance that it would provide NielsenIQ with ███ ██████████.  Circana then informed NielsenIQ that it would provide ██████████

█████████ the following week.  Circana did not provide █████████ until nine days later.

212.    Upon ████████████████████████████████, NielsenIQ immediately identified ██████████████████████ to Circana on June 26, 2023.  In response, Circana stated that █████████████████████████ ███████████████████ on June 29, 2023, for NielsenIQ, with the ████████████ ██.

213.    Circana was aware that it would take weeks, at minimum, for a company to effectively █████████████████.

214.    Nevertheless, Circana gave NielsenIQ just three days to ██████████████ ████████████████████████.

215.    After providing NielsenIQ with the █████████, and without seeking NielsenIQ's approval, Circana unilaterally began to ████████████████████ just three days later.

216.    Once Circana implemented its ██████████████, NielsenIQ quickly discovered that Circana's assurances that there would be ██████████████████████ █████████████████████████.

217.    In actuality, the ██████████████████████████ ███████████████████████████████████████████ ████████████████████.

218.    Specifically, in addition to other issues, NielsenIQ has discovered that Circana has made █████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

219.   For example, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████.

220.   Moreover, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.  While most of the

████████████████████████████████████████████

██████████████████████████████████.

221.   In addition to the above violations, NielsenIQ has further discovered that Circana

has completely changed █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████.  Moreover, Circana has

experienced significant ███████████████████████████████

████████████████████████████████████████████████.

NielsenIQ notified Circana of issues on multiple occasions.  For example, on July 19, 2023,

NielsenIQ notified Circana of the ████████████████████████████████

██████.

222.   The foregoing violations have ████████████████████████

████████████████████████████████████████████████████

████████████████████.

223.    Circana's violations have further put ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ .

224.    To date, Circana has refused to provide any ████████████████

████████████████████████████████████████████████████

████████████████████████ .

225.    Rather, since implementing its ████████████████ , Circana has been

entirely unwilling to ████████████████████████████ and has instead

engaged in a course of willful misconduct designed to exacerbate the harm caused to NielsenIQ.

226.    For example, once NielsenIQ discovered the above issues ████████████

████ , NielsenIQ asked Circana for ████████████████████████

████████████████████████████████████████████████████

████████████████████████ . As Circana was well aware,

NielsenIQ relied upon ████████████████████████████████████

████████████████████ . In fact, Circana is required to provide

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ .

227.    In response, Circana repeatedly refused to provide these ████████████

████████████████████████ .

228.    After intervention from NielsenIQ's legal department, Circana provided the

████████████████████████████████████████████ and that Circana

had previously made a false representation to NielsenIQ.

229.    Circana's delay in ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████.

230.    These ████████ undoubtedly existed for months, because ████████████

████████████████████████████████████████████████████████

██████████████████████████████████. Moreover, they

undoubtedly existed for months because Circana is required ████████████████████

████████. Circana's failure to provide them when it made its decision to ████████████

████████ as well as its further refusal to provide them upon NielsenIQ's requests was

undeniably deliberate.

231.    Moreover, despite the numerous communications that NielsenIQ has sent to

Circana ████████████████████████████████████████████ Circana

continues to delay and has refused ████████████████.

232.    Meanwhile, NielsenIQ ██████████████████████████████████

██████████████████████████████████████████████.

233.    In fact, NielsenIQ had to ██████████████████████████████

████ and has not been able to ████████████████████████ due to Circana's errors.

234.    Upon information and belief, Circana's conduct in connection with its

████████████████████████ was deliberate and conducted for the purpose of causing

harm to NielsenIQ, who is now its direct business competitor.

235.    Circana's breaches of the Agreement and bad faith conduct constitute willful

misconduct, or at the very least, gross negligence.

**N. Circana Fails to Provide** ████████████████████████████████

236.    Circana has also failed to provide NielsenIQ with ████████████████
████████████████████████████████████████████████████.

237.    Section 4(e) provides that ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████ However, in order to
████████████████████████████████████████████████████████████
████████████████████████████████████████ *See* Amendment §
4(e).

238.    However, for the ████████████████████████████████████████
████████████████████████████████████████████████████████████
specified in the Amendment.

239.    As Circana failed to satisfy its requirements under Section 4(e), Circana was not
████████████████████████████████████████████.

**FIRST CAUSE OF ACTION AGAINST DEFENDANT**
**(Declaratory Judgment under 28 U.S.C. § 2201 of Breach of Contract by NPD)**

240.    NielsenIQ restates, re-alleges, and incorporates by reference each and every
allegation set forth in paragraphs 1 through 239 as though fully set forth herein, and incorporates
them by reference herein.

241.    A real and justiciable controversy exists between the parties concerning their respective rights and liabilities under the Agreement.  For example, Defendant NPD's counsel has confirmed the parties' disagreement in multiple letters and has repeatedly stated NPD's intention to license the CPG Licensed Data, which includes the "shadow panel" data, to third parties.  Granting such a license would put NPD in immediate breach of the Agreement because ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████."

242.    A real and justiciable controversy also exists between the parties concerning their respective rights and liabilities under the Agreement given that Defendant NPD is on the verge of consummating a merger with IRI, NielsenIQ's direct competitor, which NPD and IRI, in their joint press release, have said they expect to conclude in 2022.

243.    Without sufficient assurances, such a merger would breach ████████ of the Agreement, ████████████████████████████████████████████████████████████ ████████████████████████████████████.

244.    ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████.

245.    ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████.

246.     This trade secret and confidential information was provided to NPD pursuant to the confidentiality provisions in the parties' Agreement.

247.     ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

248.     ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████.

249.     NPD does not dispute its intentions to disclose to IRI and misuse NielsenIQ's confidential and trade secret information.  Instead, NPD contends it is not obligated to protect certain NielsenIQ confidential and trade secret information.

250.     Since the parties entered into the Agreement, NielsenIQ has at all times complied with the Agreement, ████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████.

251.     Despite NielsenIQ's compliance, ████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

252.    NielsenIQ further requests any and all ancillary relief necessary and appropriate to effectuate the declaratory judgment.

253.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

**SECOND CAUSE OF ACTION AGAINST DEFENDANT**
**(Declaratory Judgment under 28 U.S.C. § 2201 by Defendant ██████████████)**

254.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 253 as though fully set forth herein, and incorporates them by reference herein.

255.    A real and justiciable controversy exists between the parties concerning their respective rights and liabilities under the Agreement relating to ████████████  For example, Defendant Circana's counsel has confirmed the parties' disagreement in multiple letters and has repeatedly stated Circana's allegations that NielsenIQ has ███████████████ in violation of the Agreement.  NielsenIQ requests that this Court issue a Declaratory Judgment to the effect that NielsenIQ is ███████████████████████████████

████████████████████████████████████████████

███████.

256.    NielsenIQ further requests any and all ancillary relief necessary and appropriate to effectuate the declaratory judgment.

257.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

## THIRD CAUSE OF ACTION AGAINST DEFENDANT
### (Breach of Contract by Defendant)

258.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 257 as though fully set forth herein, and incorporates them by reference herein.

259.    ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

260.    As alleged in paragraph 250, NielsenIQ has performed each and every one of its material obligations under the Agreement.

261.    NPD has agreed to merge with IRI, NielsenIQ's most aggressive and significant competitor, █████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████ This merger is binding and is expected to close in 2022.

262.    █████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████.

263.    ███████████████████████████████████████ ██████████████████████████████████████ ███████████

264.    █████████████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████████████



265.

266.

267.

268.

269.

270.

271.

████████████████████████████████████████████████████

████████████████████████████████████████████████████ .

272.     NielsenIQ has been damaged by NPD's breaches of contract in an amount to be

determined at trial.

273.     WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more

fully below.

**FOURTH CAUSE OF ACTION AGAINST DEFENDANT**
**(Breach of Contract by Defendant** █████████████████████ **)**

274.     NielsenIQ restates, re-alleges, and incorporates by reference each and every

allegation set forth in paragraphs 1 through 273 as though fully set forth herein, and incorporates

them by reference herein.

275.     ████████████████████████████████████████

████████████████████████████████████████ .

276.     As alleged in paragraph 250, NielsenIQ has performed each and every one of its

material obligations under the Agreement.

277.     Circana's conduct in connection with its ████████████████ , as

identified above, has violated various provisions of the Agreement, Amendment, and

attachments thereto, including ████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

██████████████ .

278.    Circana engaged in willful misconduct, or at least gross negligence, in committing the foregoing violations of the Agreement, Amendment, and attachments thereto.

279.    NielsenIQ has been damaged by Circana's breaches of contract in an amount to be determined at trial.

280.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

## FIFTH CAUSE OF ACTION AGAINST DEFENDANT
### (Anticipatory Breach of Contract by Defendant)

281.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 280 as though fully set forth herein, and incorporates them by reference herein.

282.    ███████████████████████████████████████████████ ███████████████████████████████████████.

283.    As alleged in paragraph 250, NielsenIQ has performed each and every one of its material obligations under the Agreement.

284.    NPD intends to merge with IRI, NielsenIQ's direct competitor, ███████ ███████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████.

285.    ███████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

    286.    ████████████████████████████████████████

██████████████████████████████████████████████.

    287.    NielsenIQ will be damaged by NPD's breaches of contract in an amount to be determined at trial.

    288.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

## SIXTH CAUSE OF ACTION AGAINST DEFENDANT
### (Breach of Duty of Good Faith and Fair Dealing)

    289.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 288 as though fully set forth herein, and incorporates them by reference herein.

    290.    ████████████████████████████████████████

███████████████████████████████.

    291.    As alleged in paragraph 250, NielsenIQ has performed each and every one of its material obligations under the Agreement.

    292.    ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████.

    293.    ████████████████████████████████████████

█████████████████████████████████



300.     In addition, NPD's post-lawsuit ████████████████████████████

████████████████ knowingly undermine the value of NielsenIQ's CPG products, harming

NielsenIQ's customer relationships and financial performance.

301.     This post-lawsuit conduct ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ .

302.     This post-lawsuit conduct also includes Circana's false statements to NielsenIQ

that Circana's ████████████████████████████████████████

████████ , Circana's intentional failure to provide NielsenIQ with the ████████████████

████████████████████████████████████ , and Circana's false

statements that it ████████████████████████████ and the delay caused by its repeated

refusal to provide them to NielsenIQ.

303.     This post-lawsuit conduct deprives NielsenIQ of the benefits of its bargain with

NPD.

304.     NielsenIQ has been damaged by NPD's breach of the duty of good faith and fair

dealing in an amount to be determined at trial.

305.     WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more

fully below.


## <u>SEVENTH CAUSE OF ACTION AGAINST DEFENDANT</u>
**(Threatened Trade Secret Misappropriation under the Defend Trade Secrets Act)**

306.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 305 as though fully set forth herein, and incorporates them by reference herein.

307.    This is a claim for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, for the threatened misappropriation of NielsenIQ's trade secrets on and after May 11, 2016.

308.    NielsenIQ owns and possesses certain confidential, proprietary, and trade secret information that Defendant threatens to misappropriate.

309.    NielsenIQ's Trade Secrets are directed towards ███████████████████
███████████████████████████████████████████████████
█████████████████████████████████████.

310.    ███████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
█████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████.

311.    NielsenIQ's Trade Secrets relate to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate or foreign commerce.

312.    NielsenIQ's Trade Secrets are used continuously in its operations.

313.    NielsenIQ's Trade Secrets are of immense value to NielsenIQ's business, are the result of substantial investment of money and effort by NielsenIQ, and form the foundation for NielsenIQ's competitive edge in the consumer data and analytics industry.

314.    This information is among the most confidential proprietary and trade secret information in the consumer data industry – it is precisely how competitors differentiate themselves.

315.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who could obtain economic value from the acquisition, disclosure, or use of the information because industry competitors differentiate themselves by offering unique data products – which depends on the collection of unique information that is proprietary and confidential to each industry competitor.

316.    NielsenIQ's Trade Secrets contribute to its continued position of technology leadership and uniquely capable product offering and are extremely difficult to independently or properly acquire or duplicate.

317.    ███████████████████████████████████████████████████

██████████████████████████. These trade secrets are unique and confidential to NielsenIQ.  NielsenIQ has received industry praise for its ability to offer data products with minimal gaps, inaccuracies, and biases, which is based on the use of NielsenIQ's Trade Secrets during the collection process.

318.    As a result, gaining access to how NielsenIQ collects, processes, uses, and transforms consumer data into its products would provide an immense advantage to competitors. Thus, NielsenIQ's Trade Secrets are of the nature that any reasonable business in the industry would carefully protect this material from disclosure to a competitor.

319.    

320.

321.

322.    In violation of NielsenIQ's rights, Defendant NPD threatens to misappropriate NielsenIQ's Trade Secrets and confidential information.

323. 

324.

325.    Upon information and belief, without NielsenIQ's consent, Defendant NPD has already disclosed NielsenIQ's Trade Secrets to IRI, including the parties' Agreement and Amendment, which are confidential on their face and reference NielsenIQ's Trade Secrets, in advance of the now-binding merger.

326.    Defendant NPD is aware and has been aware at all times that unauthorized disclosure and/or use of NielsenIQ's confidential, proprietary and trade secret information is prohibited by obligations in the Agreement.

327.    Upon information and belief, the combined NPD-IRI entity intends to use NielsenIQ's Trade Secrets and confidential information to compete directly against NielsenIQ in the market for consumer data and analytics.

328.    Use of NielsenIQ's confidential, proprietary and trade secret information will provide significant competitive benefits to NPD and its newly-formed entity with IRI, including in NPD's and IRI's development of competing consumer data and analytics products and services and commercialization efforts for those products and services.

329.    NielsenIQ's Trade Secrets were and are used by NielsenIQ in its business continuously and will give NPD and its newly formed entity with IRI an opportunity to obtain an advantage over competitors who do not know or use them.

330.    As a result of the aforementioned allegations, NPD will wrongfully convert and misappropriate NielsenIQ's confidential, proprietary and trade secret information, which it will use for its benefit and to the detriment of NielsenIQ.

331.    NPD's aforementioned threatened acts to wrongfully convert and misappropriate NielsenIQ's confidential, proprietary and trade secret information will be intentional, knowing, willful, malicious, fraudulent and oppressive.  The actions constitute threatened misappropriation under the DTSA, 18 U.S.C. § 1839.

332.    ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████.

333.    If not enjoined by this Court, NPD will benefit from the misappropriation and use of NielsenIQ's Trade Secrets, causing NielsenIQ continued irreparable harm, damage and injury.

334.    NielsenIQ will be damaged by all of the foregoing, and is entitled to its injunctive relief as well as damages, in an amount to be determined at trial, and an award of exemplary damages and attorneys' fees.

335.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

**EIGHTH CAUSE OF ACTION AGAINST DEFENDANT**
**(Threatened Trade Secret Misappropriation under New York Common Law)**

336.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 335 as though fully set forth herein, and incorporates them by reference herein.

337.



338.

339.

340.    NielsenIQ has, at all times, taken reasonable measures to protect the confidentiality of this information, including via the use of access restrictions, separate databases, confidentiality agreements, and a comprehensive security program that meets industry standards and best practices.

341.    NielsenIQ's Trade Secrets are not readily ascertainable by proper means, are of immense value to NielsenIQ's business, are the result of substantial investment of money and effort by NielsenIQ, and form the foundation for NielsenIQ's competitive edge in the consumer data and analytics industry.

342.    NielsenIQ's Trade Secrets would be of great value to competitors.

343.    As set forth above, NielsenIQ's Trade Secrets enable NielsenIQ's performance and are extremely difficult to independently or properly acquire by proper means or duplicate.

344.    NPD has repeatedly stated that it will only provide protection for just two of the fourteen NielsenIQ Trade Secrets, thereby threatening disclosure and misuse of the other twelve. Moreover, NPD has only agreed to avoid disclosing these two NielsenIQ Trade Secrets *while* this litigation is pending.

345.    

346.    

347.    WHEREFORE, NielsenIQ prays for judgment against NPD as set forth more fully below.

## NINTH CAUSE OF ACTION AGAINST DEFENDANT

**(Breach of Contract by Defendant –** ██████████████████████████
██████████

348.    NielsenIQ restates, re-alleges, and incorporates by reference each and every allegation set forth in paragraphs 1 through 347 as though fully set forth herein, and incorporates them by reference herein.

349.    ████████████████████████████████████████████
████████████████████████████████████.

350.    As alleged in paragraph 250, NielsenIQ has performed each and every one of its material obligations under the Agreement.

351.    Section 4(e) of Amendment No. 1 requires ████████████████████
████████████████████████████████████████████
████████████████.

352.    However, for ████████████████████████████
████████████████████████████████████████████
████████████████.

353.    As Circana failed to satisfy its requirements under Section 4(e), Circana was not ████████████████████████████.

354.    NielsenIQ is therefore ████████████████████████████
████████████.

355.    WHEREFORE, NielsenIQ prays for judgment against Circana as set forth more fully below.

**PRAYER FOR RELIEF**

WHEREFORE, NielsenIQ prays for relief and judgment as follows:

(a)     For an order preliminarily and permanently enjoining Circana, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and all persons in active concert or participation with it from using, sharing, transferring, or licensing the CPG Licensed Data or disclosing NielsenIQ intellectual property and confidential information in violation of the Agreement;

(b)     For a judgment declaring that:



1.

2.

3.

4.     Circana has willfully and maliciously misappropriated NielsenIQ's Trade Secrets and confidential information; and

5.

(c)     For an entry of judgment holding Circana liable for anticipatory breach of contract, misappropriation of trade secrets, breach of contract, breach of the duty of good faith and fair dealing, and unfair competition;

(d)      For an order awarding NielsenIQ money damages, compensatory damages, actual damages, and/or profits, according to proof, resulting from Defendant Circana's anticipatory breach, misappropriation of NielsenIQ's Trade Secrets, breach of contract, breach of the duty of good faith and fair dealing, and unfair competition;

(e)      ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ ;

(f)      For an order awarding NielsenIQ its costs and attorneys' fees;

(g)      For an award of compensatory damages, exemplary damages, punitive damages, and pre-judgment interest at a legal rate through the date of the judgment; and

(h)      For any and all other legal and equitable relief as may be available under law and that the Court may deem proper.

## DEMAND FOR A JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff NielsenIQ demands a trial by jury of all issues so triable.

Dated: November 16, 2023
       New York, NY

PAUL HASTINGS LLP

By:      */s/ Joshua A. Berman*

Joshua A. Berman
Laura Logsdon
Rita Fishman
200 Park Ave
New York, New York 10166
T: (212) 318-6000
joshuaberman@paulhastings.com
lauralogsdon@paulhastings.com
ritafishman@paulhastings.com

*Attorneys for Plaintiff*
*Nielsen Consumer LLC d/b/a*
*NielsenIQ*